# UNITED STATES *v.* FORTY-THREE GALLONS OF WHISKEY.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

Decided May 7th, 1883.

*Indians—Internal Revenue—License—Spirituous Liquors—Treaties.*

The payment of a special internal revenue tax for selling liquors in a collection district does not authorize the licensee to introduce or to attempt to introduce spirituous liquors or wines into Indian country in violation of the act of June 30th, 1834, 4 Stat. 729, as amended by the act of March 15th, 1864, 13 Stat. 29, when an Indian treaty, ceding lands embraced within the territory covered by the license, provides that the laws of the United States then in force, or which might thereafter be enacted, prohibiting the introduction and sale of spirituous liquors in the Indian country, should be in full force and effect throughout the country ceded, till otherwise ordered by Congress or the President.

Same case in 93 U. S. 188, referred to.

Information and libel in the court below of goods of one Lariviere, seized by an Indian agent of the United States for attempted violation of the laws forbidding the introduction and sale of spirituous liquor in the Indian country. The case was before the court at October term, 1876, 93 U. S. 188. The issues that have now come for settlement, and the facts necessary to their comprehension, are fully stated in the opinion of the court.

*Mr. Assistant Attorney-General Maury* for the United States.

*Mr. C. K. Davis* for defendant in error.

Mr. JUSTICE FIELD delivered the opinion of the court.

By the treaty between the Red Lake and Pembina bands of Chippewa Indians and the United States, concluded on the 2d of October, 1863, those Indians ceded to the United States their right, title, and interest to certain lands owned and claimed by them in the State of Minnesota, and the Territory of Dakota. 13 Stat. 667. The seventh article of the treaty

stipulated that the laws of the United States then in force or that might thereafter be enacted, prohibiting the introduction and sale of spirituous liquors in the Indian country, should be in full force and effect throughout the country thereby ceded until otherwise directed by Congress or the President of the United States. The 20th section of the act of June 30th, 1834, entitled "An Act to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontier," 4 Stat. 729, as amended by the act of March 15th, 1864, 13 Stat. 29, was in force when this treaty was made; and it forbids any one, under certain penalties, to sell or dispose of any spirituous liquors or wine to an Indian under the charge of an Indian superintendent or agent; or to introduce or to attempt to introduce them into the Indian country, unless done by order of the War Department or of some authorized officer under it. And the section provides for the seizure and forfeiture of liquors thus introduced and the goods and property of the party violating the statute with which they are found. The following is the section as amended:

"SEC. 20. *And be it further enacted*, That if any person shall sell, exchange, barter, or dispose of any spirituous liquors or wine to any Indian under the charge of any Indian superintendent or Indian agent appointed by the United States, or shall introduce or attempt to introduce any spirituous liquor or wine into the Indian country, such person, on conviction thereof before the proper District or Circuit Court of the United States, shall be imprisoned for a period not exceeding two years, and shall be fined not more than $300: *Provided, however*, That it shall be a sufficient defence to any charge of introducing or attempting to introduce liquor into the Indian country if it be proved to be done by order of the War Department, or any officer duly authorized thereunto by the War Department. And if any superintendent of Indian affairs, Indian agent, or sub-agent, or commanding officer of a military post, has reason to suspect, or is informed that any white person or Indian is about to introduce or has introduced any spirituous liquor or wine into the Indian country, in violation of the provisions of this section, it shall be lawful for such superintendent, sub-agent, or commanding officer to cause the boats,

stores, packages, wagons, sleds, and other places of deposit of such person to be searched; and if any such liquor is found therein, the same, together with the boats, teams, wagons, and sleds used in conveying the same, and also the goods, packages, and peltries of such person, shall be seized and delivered to the proper officer, and shall be proceeded against by libel in the proper court, and forfeited one-half to the informer and the other half to the use of the United States; and if such person be a trader, his license shall be revoked and his bonds put in suit. And it shall, moreover, be the duty for any person in the service of the United States, or for any Indian, to take and destroy any ardent spirits or wine found in the Indian country, except such as may be introduced therein by the War Department. And in all cases arising under this act Indians shall be competent witnesses."

Under this section the present libel of information was filed in the District Court of the District of Minnesota, to enforce the forfeiture of certain spirituous liquors, which are particularly described, and other merchandise found with them at the time of seizure. In one of its counts the libel sets forth that Bernard Lariviere, a white person, late of the village of Crookston, county of Polk, and State of Minnesota, did, on the 2d of February, 1874, unlawfully carry and introduce into the country ceded to the United States under the treaty mentioned— namely, into the county of Polk, which is a part of the ceded country—the spirituous liquors described; that such introduction was in violation of the provisions of the 20th section of the act of Congress above quoted; that he owned, and at the time had in his possession with the liquors, a quantity of goods, packages, and peltries, a list of which is contained in a schedule annexed to the libel; that an Indian agent, duly appointed, having reason to suspect, and having been informed, that spirituous liquors had been introduced by Lariviere, caused his stores, packages, and peltries to be searched, and there found the liquors mentioned, which he in consequence seized, together with the other goods. In another count the libel sets forth substantially the same matters, with the addition that the liquors were introduced into the country ceded with intent to

sell, dispose of, and distribute the same among the bands and tribes of Chippewa Indians then under charge of the Indian agent, and frequenting the county of Polk and village of Crookston, and living there or near the place.

To this libel Lariviere and one Clovis Guerin appeared as claimants of the goods seized, and demurred to the libel on the ground that the court had no jurisdiction; that the property was never introduced into the Indian territory, but, as appeared by the libel, was searched and seized in an organized county of the State of Minnesota, and hence that the seizure was without authority of law. The demurrer thus interposed was sustained by the district court, and judgment rendered against the United States, and this judgment was affirmed by the circuit court. The case was then brought to this court, where the judgment was reversed and the cause remanded, with directions to overrule the demurrer. Several important legal and constitutional questions were raised on the argument here, and it was held that Congress, under its constitutional power to regulate commerce with the Indian tribes, may not only prohibit the introduction and sale of spirituous liquors in the Indian country, but extend such prohibition to territory in proximity to that occupied by Indians; that it is competent for the United States, in the exercise of the treaty-making power, to stipulate in a treaty with an Indian tribe that within the territory thereby ceded the laws of the United States, then and thereafter enacted, prohibiting the introduction and sale of spirituous liquors in Indian country, shall be in full force and effect until otherwise directed by Congress or the President of the United States, and that a stipulation to that effect will operate *proprio vigore*, and be binding upon the courts, although the ceded territory is situated within an organized county of a State. These conclusions are stated in a very clear and able opinion by Mr. Justice Davis, *United States* v. 43 *Gallons of Whiskey*, 93 U. S. 108.

When the case went back to the district court for trial, and the demurrer was overruled, the claimant Lariviere filed an answer to the libel containing inconsistent defences. He first denied that he ever introduced into the ceded territory the liquors as

charged, and he claimed the property, except the liquors, as his; and as to those he disclaimed ownership. But, although denying their introduction, he averred that the acts charged against him were done under the authority of the War Department, and that the liquors were not introduced for the purpose of sale or in violation of any law or treaty. He subsequently amended this answer by adding an averment to the effect that the territory ceded under the treaty mentioned lay within the limits of a collection district under the United States internal revenue laws; that persons resident within it and within the county of Polk and at the village of Crookston, engaged in the business of retailing spirituous liquors, had been assessed and required to pay taxes upon their business, and were thereby licensed to carry on that business and sell spirituous liquors in that county; and that he also had been thus assessed, taxed, and licensed as a retail dealer, and that his license had never been revoked nor the tax paid for the same returned. The other claimant, Guerin, averred that the property seized, except the liquors, had been transferred to him as collateral security for a debt, and denied every traversable allegation in the information save the seizure by the Indian agent. On the trial evidence was introduced by the government tending to show that Lariviere introduced the liquors mentioned with the intent to sell them to Indians under the charge of the United States Indian agents, and also to show the circumstances of the seizure. Against the objection of the government Lariviere gave evidence of all the circumstances touching the assessment and collection of the internal revenue tax from him and other sellers of liquor by retail in the county of Polk. The court charged the jury that while the mere introduction of spirituous liquors in the ceded territory was *prima facie* evidence of an unlawful purpose, this evidence was neutralized by proof that the claimant held at the time a receipt of the collector of internal revenue for the special tax required to be paid by a retail liquor dealer, and hence that the burden of proof was shifted on the government to show that the liquors were introduced with the intent to sell them to the Indians. It also charged that " the uncontroverted facts found for the defence were a license to Lariviere to take liquor to

Crookston and gave him the right to do so, and that, for so doing, he was subject to no penalty under the national law." To this charge an exception was taken. There was a verdict for the claimant, and judgment was entered thereon that the libel be dismissed. The case was then taken to the circuit court and the judgment of the district court was there affirmed. To review that judgment the case is brought here.

The only question for our consideration, as thus seen, is whether Lariviere's payment of the special internal revenue tax for selling liquors in the collection district embraced by the ceded territory exempted him from the penalties of the act of 1864. We are clear that it did not. Congress never intended to interfere with the operation of the treaty, or to sanction the sale of liquors in any ceded territory where an express stipulation provides that they shall not be sold. The evils resulting from the use of spirituous liquors are so many and so appalling that the government has, from an early period of our history, labored to prevent their introduction among the Indians. In order more effectually to secure this result, laws prescribing severe penalties have been enacted, and authority has been vested in the Indian agents to arrest traffickers in the prohibited article, and to seize and confiscate their property found with it. It would require very clear expressions in any general legislation to authorize the inference that Congress purposed to depart from its long established policy in regard to a matter of so vital importance to the peace and to the material and moral well-being of these wards of the nation. There is also another consideration. The laws of Congress are always to be construed so as to conform to the provisions of a treaty, if it be possible to do so without violence to their language. This rule operates with special force where a conflict would lead to the abrogation of a stipulation in a treaty making a valuable cession to the United States.

The unauthorized introduction of liquors into the ceded territory constitutes the offence, although if they were not sold or given away, no injurious consequences would follow; but once allow their indiscriminate or general introduction and the law would be evaded without possibility of detection. The intro-

duction is, therefore, forbidden, unless permitted by the order of the War Department or of some officer authorized by it. The establishment of the collection district, embracing the ceded territory, whilst providing for the collection of taxes on certain kinds of business, did not authorize, nor was it intended to authorize, business which was otherwise specifically forbidden. The *License Tax Cases,* 5 Wall. 462, do not conflict with, but rather support this view. They merely decide that the licenses of the United States for selling liquors and dealing in lotteries exempted the party from the penalties of the revenue law to which he would otherwise be subjected. They gave no exemption from State laws or the taxes they imposed for the business carried on. They conferred no authority by themselves to carry on any business within a State. They were in the nature of taxes on the business which the State permitted. The court, speaking by Chief Justice Chase, said that if the licenses were to be regarded as giving authority to carry on the branches of business which they licensed it might be difficult, if not impossible, to reconcile the granting of them with the Constitution. "But," he added, "it is not necessary to regard these laws as giving such authority. So far as they relate to trade within State limits they give none and can give none. They simply express the purpose of the government not to interfere by penal proceedings with the trade nominally licensed, if the required taxes are paid. The power to tax is not questioned, nor the power to impose penalties for non-payment of taxes. The granting of a license, therefore, must be regarded as nothing more than a mere form of imposing a tax, and implying nothing except that the licensee shall be subject to no penalties under national law if he pays it." Though these cases are cited by the defendant, they affirm the doctrine that the licenses under the then existing law, being designed merely to secure the payment of taxes to the United States, did not interfere with other legitimate regulations of business nor sanction it where otherwise prohibited.

The case of the *Cherokee Tobacco Tax,* 11 Wall. 616, cannot be treated as authority against the conclusion we have reached. The decision only disposed of that case, as three of the judges

of the court did not sit in it and two dissented from the judgment pronounced by the other four.

It follows from the views expressed that the judgment of the court below must be reversed and a new trial had ; and

*It is so ordered.*